JOHN B. LEATHERS v. WM. J. GRAY.

*Rule in Shelley's Case.*

Where a will devised land to L during her natural life, and after her
    death to the begotten heirs or heiresses of her body; *It was held,*
    that the rule in Shelley's case did not apply, and the children of L
    took a remainder as purchasers after her death.

*(Jarvis* v. *Wyatt,* 4 Hawks, 254; *King* v. *Utley,* 85 N. C., 61; cited).

This was a CIVIL ACTION, tried before *Connor, Judge,* at the
November Term, 1886, of ORANGE Superior Court, upon the
following case agreed:

I. That by the will of Joseph Armstrong, dated the 23d
day of May, 1839, and duly admitted to probate at Novem-
ber Term, 1840, it is provided: " I also give to the said Peggy
Armstrong the use, service, or benefit of all the following
property named in this clause, during her natural life, or
marriage, and no longer, to-wit: three tracts or parcels of land,
all being on the waters of Flat river. First, the tract that
my father, William Armstrong, lived and died on, contain-
ing 220 acres ;. the second is a tract that I bought from Henry
Berry, containing 17 acres ; the third is a tract that I bought
from my brother, William Armstrong, containing 216 acres."
And by the same will it is further provided : " I also give
and bequeath to my son, James W. Armstrong, the follow-
ing property, to be received as soon as convenient after the
death or marriage of his mother, Peggy Armstrong, viz.: one
half of three tracts of land, all lying on the waters of Flat
river. The first is the tract my father lived and died on,
containing 220 acres ; the second is the tract that I bought
from Henry Berry, containing 17 acres ; and the third is a
tract that I bought from my brother, William Armstrong,
containing 216 acres," and also : " I give and bequeath to my
daughter, Parthenia Leathers, during her natural life, and

after her death, to the begotten heirs or heiresses of her body forever, one half of three tracts of land, all lying on the waters of Flat river. The first tract is the tract my father, William Armstrong, lived and died on, containing 220 acres; the second is a tract that I bought from Henry Berry, containing 17 acres; and the third is a tract that I bought from my brother, William Armstrong, containing 216 acres, to be received as soon as sonvenient after the death of her mother, Peggy Armstrong." William J. Gray was a witness to said will, and proved the execution thereof.

II. That on the 5th day of December, 1845, John B. Leathers and Parthenia and J. W. Armstrong, by J. B. Leathers, his agent and attorney in fact, duly appointed (Peggy Armstrong then being dead), executed to the defendant William J. Gray, in consideration of the sum of seventeen hundred and sixty dollars and twenty-five cents, a fee simple deed to the above described lands, with warranty, and said lands are described as bounded as follows: (giving metes and bounds), containing four hundred and seventy acres more or less, lying in the counties of Orange and Person, on the waters of Flat river, adjoining the lands of Chas. Holeman, Henry Berry, James Holeman and others, and the said William J. Gray has been in the continued uninterrupted possession of said lands since that time.

III. That Parthenia Leathers died on the 29th of November, 1885, and her husband, J. B. Leathers, died August 21st, 1880, and the plaintiff John B. Leathers is one of the two children of said J. B. and P. Leathers, now 36 years of age, the other child, F. S. Leathers, having, on January 4th, 1886, executed a quitclaim deed to W. J. Gray to said land."

Upon these facts, his Honor rendered the following judgment: "Upon the foregoing facts agreed upon between the plaintiff and the defendant, I am of opinion that by the operation of the Rule in Shelley's case, the plaintiff's mother, Parthenia Leathers, took, under the will of Joseph Armstrong,

a fee simple estate in the share of the lands devised to her—the will having been made and the conveyance by her to the defendant prior to 1856. The question of the effect of the act of 1856, (§1329 of *The Code*,) cannot arise. The deed executed in 1845 by said Parthenia Leathers and her husband, conveyed to the defendant a fee simple estate, and the plaintiff is not entitled to recover.

"The plaintiff will therefore take nothing by his suit, and the defendant will recover judgment against him and his surety for the cost in this behalf expended."

From this judgment the plaintiff appealed.

*Mr. John Manning*, for the plaintiff.
*Messrs. John W. Graham* and *John Devereux, Jr.*, for the defendant.

DAVIS, J., (after stating the facts). The sole question presented for our consideration is, did Parthenia Leathers take an estate in fee, under the will of Joseph Armstrong, by the operation of the Rule in Shelley's case—or did she take only an estate for life, with remainder to her children? In what sense were the words "heirs or heiresses" used by the testator? Were they used to denote the indefinite succession of persons *in infinitum*, technically designated by the word "*heirs?*" If so, the Rule in Shelley's case applies, and Parthenia took an estate in fee.

Prof. Minor, in his "Institutes," page 395, says: "The rule is not a means to *discover the intention* of the grantor or testator, but supposing the intention ascertained, the rule *controls it*, giving effect to the *general and legal*, rather than to the *more particular and prescribed* intent. The party making such a limitation, has in his mind two purposes, which are legally in conflict. One is to give the ancestor only a life estate; the other to limit the land to his heirs collectively, and in indefinite succession. These two intents cannot stand

together, without more or less of general mischief to the public welfare; and the rule prevails, simply to subordinate the particular, and apparently less important design of limiting the ancestor's interest to a life estate, to the more comprehensive, and probably the preferred purpose of transmitting the inheritance in the manner indicated. If this double intent appears, the rule must prevail, but if it can be plainly collected from the will, that the testator used the word " heirs," as a *descriptio personarum*, then the rule in *Shelley's case* is not applicable. The word " heirs," or " heirs of the body," must be used in its *technical* sense, as importing a class of persons to *take indefinitely in succession*. Hence, if it appears that the words were not employed in this sense, but inaccurately, as designating particular individuals only, the rule in *Shelley's case* would not be applicable; but the persons who, at the time of the limitation, were the ancestor's heirs apparent, or presumptive, would take a vested remainder." Minor's Institutes, 395.

In the case of *Jarvis* v. *Wyatt*, 4 Hawks, 254, an effect was given to the words, " heirs of the body," which seems not to have been followed or referred to in subsequent cases in this State. In that case Judge HALL says : " But there is another view of this case, taken by my brother HENDERSON, to which I altogether subscribe, which leads to the same result; and that is, that the words " heirs of the body," give an estate in fee by *purchase*, although there is an estate for life to the parent preceding it, because *heirs of the body* are not *heirs general*, and our law, since estates in tail are done away with, recognizes none as *heirs*, except such as can inherit collaterally as well as lineally; and that, although when there is an estate for life to the parent with remainder to his *heirs*, both estates unite in the parent, under the operations of *Shelley's case;* yet there can be no such union when the remainder is to heirs of the body. Our law knows of no such heirs; of course they are words of description, and those that take under them must

take as *purchasers.* In England the case is otherwise, because heirs of the body are recognized as heirs, and can inherit as such."

A different view from this was taken in the case of *King* v. *Utley,* 85 N. C., 61. Although the rule in *Shelley's case* was more strictly observed in England than in the United States, even there where it clearly appears that the words *heirs* or *heirs of the body,* were intended by the testator as *descriptio personæ,* they are words of purchase ; Theoball's Law of Wills, 340–342, and the numerous cases there cited.

Any superadded word that would change the course of indefinite succession, implied by the word "heirs" in its technical sense, takes the case out of the operation of the rule, as for instance, in England, when the gift is for life, "remainder to heirs *female,*" for that is a change of the course of descent.

Were the words "heirs or heiresses," used by the testator, Joseph Armstrong, in a technical sense; or, did he mean by them, children—"sons and daughters ?"

In the same clause of the will, he gave to his son, James W. Armstrong, one half of the land absolutely, and if he intended that Parthenia should have a similar estate, why should the form of the gift have been changed ?

Why give it to her for "her natural life," if he intended that she should have a fee ? And why add the words "or heiresses," if he meant to use the words technically ?

We think the words "heirs or heiresses," used in the will of Joseph Armstrong were intended in no technical sense, but in a sense not unusual, as children—*sons* or *daughters*—and that the rule in Shelley's case does not apply.

It would often defeat the intention of testators if wills written *inops consillii,* should be construed technically ; and we think the intent of the testator in this case is apparent, and that is, that Parthenia should have only a life estate,

and that a new *stock* of inheritance should be created in her sons and daughters.

There is error.   Let this be certified.

Error.                                                          Reversed.